UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIAN R. MCCARTHY, | Case No. 15-cv-03308-JSC |
| Plaintiff, | |
| v. | **ORDER RE: MOTION TO DISMISS SECOND AMENDED COMPLAINT** |
| MEGAN J. BRENNAN, | Re: Dkt. No. 44 |
| Defendant. | |

Plaintiff Kian McCarthy, who worked as a letter carrier for 24 years, brings this action against his former employer, the United States Postal Service, arising from the termination of his employment.[1]  The Second Amended Complaint ("SAC") alleges causes of action for disability discrimination, retaliation, failure to accommodate a disability and engage in the interactive process, and impermissible disclosure of confidential medical records, all under the Rehabilitation Act.  (Dkt. No. 42 at 9-14.[2])  Now pending before the Court is Defendant's motion to dismiss the SAC.  (Dkt. No. 44.)  After considering the parties' submissions, and having had the benefit of oral argument on January 26, 2017, the Court DENIES Defendant's motion.

BACKGROUND

**I.      Complaint Allegations**

The Court discussed the factual background of this case in a previous order and incorporates that discussion here.  (*See* Dkt. No. 25 at 2-4.)  However, as this is the first iteration

---

[1] Plaintiff initiated this action pro se, but is now represented by counsel.

[2] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

United States District Court
Northern District of California

of the pleadings that Plaintiff has filed with the benefit of counsel and the substance of the claims has changed at least in part, the Court reiterates the factual allegations here.

Plaintiff suffers from Asperger's disorder, a medical condition and mental disability classified as an "autism spectrum disorder," which causes communication deficits, inappropriate responses in conversations, misreading nonverbal interactions, sensitivity to change, and intense focus on inappropriate items, among other things. (Dkt. No. 42 ¶ 16.) Medical professionals have also noted that Plaintiff "may suffer" from a variety of other mental disabilities related to his autism, including Obsessive Compulsive Disorder, Avoidant Personality Disorder, Depression, and General Anxiety Disorder. (*Id.* ¶ 17.) His condition "ha[s] waxed and waned over the years" but his symptoms "are most pronounced in stressful or confrontational situations, like workplace interactions with supervisors or co-workers. (*Id.*) "To the untrained eye," Plaintiff's mental disability can appear "to reflect disinterest, confusion, or distrust" and manifests itself in social discomfort and unusual behavior. (*Id.*)

Plaintiff began working as a letter carrier for the Post Office in 1986. (*Id.* ¶ 14.) He worked out of the Sausalito branch office until he was terminated in January 2011. (*Id.* ¶ 15.) Throughout his career, Plaintiff served as shop steward for the letter carrier's union and received compliments and commendations from customers and residents for his work. (*Id.*) From 2001 until his termination, Plaintiff's supervisor at the Sausalito branch was Myra "Jackie" Suarez. (*Id.* ¶ 19.) Ms. Suarez "repeatedly demonstrated discriminatory animus towards persons with mental disabilities." (*Id.*) The Post Office knew about Suarez's animus and did nothing to stop it. (*Id.*)

In April 1998, the Post Office sent Plaintiff to a Fitness for Duty Examination. (*Id.* ¶ 20.) The examining physician, Dr. Stephen Raffle, concluded that Plaintiff did not "represent[ ] a safety hazard to himself or others" but was "unfit" for duty. (*Id.* ¶ 20.) Dr. Raffle believed that Plaintiff had trouble completing his job tasks in a timely manner because "he is so preoccupied with the details of the job" and his "perfectionism interferes with task completion." (*Id.* ¶ 34.) He also diagnosed Plaintiff with Obsessive Compulsive Disorder, noting that people who suffer from that disorder "have a great deal of difficulty constructively taking criticism because of their need for orderliness, parsimony and perfectionism often paralyses [sic] them in their actions." (*Id.*) Dr.

2

Raffle's unfit-for-duty determination was overturned after two other reviewers disagreed with it. (*Id.*) Dr. Raffle's Fitness for Duty Exam report contained highly sensitive, personal, and confidential information about Plaintiff's medical history and mental health status.  (*Id.* ¶ 21.) Summarizing the report, the Post Office's Associate Medical Director recommended that Plaintiff "seek treatment from a psychiatrist prior to returning to work" and "do a job that does not require postal vehicle driving or deadlines."  (*Id.* ¶ 24.)  The Post Office did not provide such accommodation; instead, in September 1998 the Post Office notified Plaintiff of his termination from employment.  (*Id.*)  In response, Plaintiff requested a second Fitness for Duty Exam.  (*Id.*) Dr. Roger Freed conducted the exam in October 1998 and found Plaintiff fit for duty.  (*Id.*)  The Post Office then conducted a third Fitness for Duty Exam, which would be binding; in March 1999 Dr. Kenneth Gottlieb found Plaintiff fit for duty.  (*Id.*)

The Post Office made Dr. Raffle's 1998 Fitness for Duty Exam report available to postal supervisors, including Ms. Suarez.  (*Id.* ¶ 21.)  In a November 2007 letter to the Letter Carriers' Union and the Postmaster, Ms. Suarez complained about Plaintiff, noting that he "files frivolous, unmerited grievances"; does not perform his letter carrier duties or follow proper procedures; and exhibits strange behavior.  (*Id.* ¶ 21.)  Ms. Suarez noted that she "ran across medical files on [Plaintiff] and his behavior is giving me great concern" especially after a murder at another Post Office station, and expressed concern for her and others' safety.  (*Id.*)  Despite knowing about Ms. Suarez's unauthorized access to Plaintiff's medical records, the Post Office took no corrective action against her.  (*Id.* ¶ 22.)

In the spring of 2010 Ms. Suarez held a pep talk with Post Office employees at the Sausalito branch to encourage them not to overrun their overtime budget.  (*Id.* ¶ 25.)  She congratulated other employees for timely deliveries but singled out Plaintiff for humiliation, stating in front of the group, "I won't name any names but I will since he's standing right here, [Plaintiff], and I'll deal with the fool later[.]"  (*Id.*)

On May 6, 2010 Ms. Suarez issued Plaintiff a letter of warning for unsafe driving and suspended him for 14 days for unauthorized overtime.  (*Id.* ¶ 26.)  On May 20, 2010 Plaintiff wrote a letter to the Post Office's San Francisco District Manager complaining about the incident

United States District Court
Northern District of California

United States District Court
Northern District of California

1   in which Ms. Suarez called him a fool in front of other employees.  (*Id.* ¶ 27.)  In June 2010,

2   Plaintiff attended an EEO mediation session with Sausalito postal managers.  (*Id.* ¶ 28.)  The Post

3   Office refused to rescind his 14-day suspension but agreed to counsel other postal employees

4   about making fun of Plaintiff.  (*Id.*)

5          In July 2010 Plaintiff became ill with kidney stones.  (*Id.* ¶ 29.)  Ms. Suarez accused him

6   of faking his pain and would not let him leave work early to see a doctor.  (*Id.*)  Plaintiff ended up

7   on off-work duty for treatment and recovery of kidney stones for several weeks.  (*Id.*)  While he

8   was out, Ms. Suarez drafted a letter to the Post Office's human resources manager, addressing

9   Plaintiff's poor performance but noting that "what worries me are not the grievances, EEOs, and

10  Letters he sends out to the Post Master General . . . but the fact that he really believes what he's

11  saying."  (*Id.* ¶ 30.)  Ms. Suarez's letter continues that Plaintiff's "[b]ehavior is becoming more

12  desperate and delusional; he is irrational and more paranoid" and notes that there was "something

13  . . . not quite right" about him.  (*Id.*)  She expresses fear about working with Plaintiff.  (*Id.* ¶ 31.)

14  She also references Dr. Raffle's 1998 report concluding that Plaintiff was unfit for duty.  She

15  complains that the report is "too old to use," and quotes the report itself nearly verbatim, stating

16  that the report concluded that Plaintiff's "condition is untreatable and that his condition [is]

17  permanent, and there is little likelihood that his condition will improve with treatment or time."

18  (*Id.* ¶ 31.)  Again, the Post Office did not address Ms. Suarez's access to the 1998 Fitness for Duty

19  Exam report.  (*Id.*)

20         The next month, Ms. Suarez wrote a handwritten note to the Post Office's human resources

21  manager stating that she "found the paperwork" on Plaintiff and "can't figure out how after all of

22  this he kept a job."  (*Id.* ¶ 32.)  She references Dr. Raffle's 1998 report, noting that the physician

23  "states that [Plaintiff] is not a danger to anyone" but Dr. Raffle "needs to come to Sausalito and

24  work with [Plaintiff] like we have to."  (*Id.*)  Days after Ms. Suarez wrote that note, the Post

25  Office ordered Plaintiff to attend another Fitness for Duty Exam, which he did the next month

26  with Dr. William Bresnick.  (*Id.* ¶ 35.)

27         All of the four Fitness or Duty Exam reports about Plaintiff indicated that he would have

28  trouble interacting with supervisors, completing tasks in a timely manner, and identifying his own

4

disabling condition or asking for help and assistance because of his disabilities.  (*Id.* ¶ 43.) Plaintiff's physician opined that the Post Office could have used Dr. Bresnick's assessment as a guide to "successfully manage" Plaintiff and "[h]ad they followed his recommendations, . . . [Plaintiff's] supervisors could have changed their approach to benefit all[,]" Plaintiff could have improved his work performance and communication with his supervisors.  (*Id.*)  The Post Office did not offer Plaintiff a reasonable accommodation or offer to discuss potential accommodations with him, and instead ridiculed him and treated him as a threat.  (*Id.*)

For example, Ms. Suarez continued to make comments evidencing her discriminatory animus.  (*Id.* ¶ 40.)  She responded to the effect of "you're crazy" when Plaintiff requested overtime.  (*Id.*)  Several weeks later, Ms. Suarez suspended Plaintiff and placed him on administrative leave for unsafe driving.  (*Id.*)  In early December 2010 Ms. Suarez submitted a request to terminate Plaintiff's employment.  (*Id.* ¶ 41.)  One week later she issued a notice of removal terminating his employment effective January 7, 2011 due to unsafe driving and unauthorized use of overtime.  (*Id.* ¶¶ 41-42; *see also id.* at 19.)

## II.     EEO Activity[3]

On September 14, 2010 Plaintiff requested an appointment for counseling and filed an Information for Pre-Complaint Counseling alleging discrimination on the basis of race, sex, age, physical disability, and retaliation for prior EEO activity arising out of the July 2010 incident when Ms. Suarez refused to allow Plaintiff to leave work early when his kidney stones were causes him intense pain, and the September 2010 written notice instructing him to attend his

---

[3] The following background is based on the exhibits attached to the declarations of Jennifer Jarvie and Jason Erlich, which are part of the administrative record of Plaintiff's EEO complaints.  (*See* Dkt. Nos. 45, 50-1.)  The Court can consider materials outside the pleading for the purposes of resolving a 12(b)(1) dispute, as the Court does here.  *See Americopters, LLC v. Fed. Aviation Admin.*, 441 F.3d 726, 732 n.4 (9th Cir. 2006).  Further, as for the 12(b)(6) analysis, in the context of employment discrimination cases courts may judicially notice the administrative record of a plaintiff's claims before the EEOC.  *See, e.g.*, *Hsu v. Donohoe*, No. 5:13-cv-02253-PSG, 2014 WL 1153912, at *2 (N.D. Cal. Mar. 20, 2014).  In doing so, the Court only notices the existence of the administrative record and does not credit the truth of any fact recounted or matter asserted in those documents.  *See In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1070 (N.D. Cal. 2010).

fourth Fitness for Duty Exam.  (Dkt. No 45 ¶ 4; Dkt. No. 45-1 at 2.)  Later the same month, Plaintiff requested another appointment for counseling and filed a second Information for Pre-Complaint counseling, again alleging discrimination on the basis of race, sex, age, physical disability, and retaliation for prior EEO activity, this time arising out of the same two incidents.  (Dkt. No. 45 ¶ 5; Dkt. No. 45-2.)  The written counseling request also alleged that "Postal management . . . subjected [Plaintiff] to discrimination and harassment and a hostile work environment[.]"  (Dkt. No. 45-2 at 2.)

In December 2010, Plaintiff filed a formal EEO complaint alleging discrimination on the basis of race, sex, age, disability, and retaliation challenging the same two incidents—*e.g.*, discrimination and verbal abuse arising out of Ms. Suarez's July 2010 refusal to let Plaintiff leave work early despite his pain and discrimination due to the September 2010 Fitness for Duty Exam order.  (Dkt. No. 44 ¶ 7; Dkt. No. 45 ¶ 6; Dkt. No. 45-3 at 2.[4])  The administrative complaint also alleged that Post Office management breached a settlement agreement.  (Dkt. No. 45-3 at 2.)  Plaintiff sought relief including equal treatment and missed overtime opportunities.  (*Id.*)  In January 2011 the EEO Office accepted Plaintiff's claim about the Fitness for Duty Examination but dismissed his claim arising out of the July refusal to let him leave work early due to pain.  (Dkt. No. 45-4 at 2-3.)

On January 26, 2011, following his termination, Plaintiff requested further appointments for counseling and filed an additional Information for Pre-Complaint Counseling, alleging discrimination on the basis of race, color, mental disability, hostile work environment—continuing violation, and prior EEO activity based on the December 8, 2010 notice of removal and placement on administrative leave.  (Dkt. No. 45-5.[5])  In the factual statement describing the incident that prompted him to seek EEO counseling, Plaintiff wrote:

---

[4] Plaintiff submitted a copy of the same December 14, 2010 EEO Complaint.  (Dkt. No. 50 ¶ 7; Dkt. No. 50-5.)

[5] Plaintiff submitted the same January 26, 2011 Information for Pre-Complaint Counseling.  (Dkt. No. 50-8.)

United States District Court
Northern District of California

> On December 8, 2010 I was issued a "Notice of Removal" and was placed on administrative leave.  On December 14, 2010 I first learned [Ms. Suarez] knew or should have known of my existing medical mental disability.  On December 14, 2010 I first learned that my personal and confidential medical records were kept at the Sausalito Post Office.

(*Id.* at 2.)  Plaintiff alleges that he filed an additional EEO complaint alleging termination on the basis of disability and prior EEO activity, and improper disclosure of his personal and confidential medical records.  (Dkt. No. 44 ¶ 8.)  The Post Office has no records of such EEO complaint.  (Dkt. No. 45 ¶ 9; Dkt. No. 51-1 ¶¶ 3-4.)  Nor has Plaintiff submitted a copy of another administrative complaint or pre-complaint form.

On February 9, 2011, the EEO Office amended Plaintiff's pending EEO Complaint to address the claims raised in his January 26 Pre-Complaint Counseling form.  (Dkt. No. 45 ¶ 10; Dkt. No. 45-6 at 2.[6])  The EEO accepted the discrimination claim arising out of the notice of removal but dismissed the claim about Plaintiff's personal medical records.  (Dkt. No. 45-6 at 3.)  According to the EEOC, Plaintiff did not respond to the EEO Office's order.  (Dkt. No. 45 ¶ 11.)  Plaintiff avers that he responded by letter of February 22, 2011 requesting that his claims for "hostile work environment" and claims relating to the Post Office's use of his medical records be re-added to his complaint.  (Dkt. No 50 ¶ 5; Dkt. No. 50-3 at 2.)  Specifically, Plaintiff wrote that the Post Office's reliance "upon [his 1998] medical records in issuing [him] a Notice of Removal . . . subject[ed him] to discrimination [and] harassment; due to [his] well documented mental disability of being diagnosed with having obsessive compulsive and schizoid personality traits."  (Dkt. No. 50-3 at 2.)

In May 2011, the EEO issued an investigative summary, which referenced that Ms. Suarez possessed Plaintiff's medical records.  (Dkt. No. 50 ¶ 7; Dkt. No. 50-4 at 11.)  The report also indicated that Plaintiff had been referred for the 1998 Fitness for Duty Exam to determine "[w]hether or not his chronic worsening behavioral actions will ever allow him to perform the essential functions of a letter carrier with or without accommodation."  (Dkt. No. 50-4 at 23.)

In June 2011 Plaintiff, then represented by counsel, requested a hearing before an

---

[6] Plaintiff submitted the same February 9, 2011 EEO order amending Plaintiff's EEO Complaint and dismissing some of his claims.  (Dkt. No. 50-2.)

United States District Court
Northern District of California

administrative judge. (Dkt. No. 45 ¶ 12; Dkt. No. 45-7.) In an order acknowledging Plaintiff's request, the EEOC directed each party to "identify any claims the agency has dismissed from the complaint during the agency investigative process . . . and to comment on the appropriateness of each dismissal" and noted that the failure to oppose in writing the agency's dismissal of any claims within 30 days would be deemed waiver. (Dkt. No. 45-8.) The EEOC has no record of a response to that Order from Plaintiff. (Dkt. No. 45 ¶ 14.) Nor has Plaintiff identified any response.

An administrative judge granted summary judgment in favor of the Post Office in July 2013, and the Post Office issued a notice of final action. (Dkt. No. 44 ¶ 11; Dkt. No. 45 ¶ 15; Dkt. No. 45-9; Dkt. No. 45-10.) After Plaintiff appealed (Dkt. No. 45-11), the EEOC affirmed the dismissal in April 2015. (Dkt. No. 44 ¶ 12; *id.* at 23; Dkt. No. 45-12.) After filing a request for reconsideration in May 2015, Plaintiff initiated this action on July 16, 2015. (Dkt. No. 44; Dkt. No. 45 ¶ 18; Dkt. No. 45-13.) The EEOC denied Plaintiff's request for reconsideration in October 2015. (Dkt. No. 45 ¶ 18; Dkt. No. 45-14.)

### III.    Procedural History

Plaintiff, then representing himself, filed the initial judicial complaint alleging that the 2010 Fitness Exam order and removal notice constituted race, gender, age, and disability discrimination and reprisal for engaging in protected EEO activity under various statutes. (Dkt. No. 1.) After the Court granted in part Defendant's motion to dismiss, Plaintiff filed a First Amended Complaint ("FAC") alleging disability discrimination, failure to accommodate, retaliation, and age discrimination. (Dkt. No. 26.) The Court then granted Defendant's motion to dismiss the FAC and granted Plaintiff's request for appointment of counsel. (Dkt. No. 39.) After counsel was appointed, Plaintiff filed the SAC, which alleges disability discrimination, retaliation, failure to accommodate a disability and engage in the interactive process, and impermissible disclosure of confidential medical records, all under the Rehabilitation Act. (Dkt. No. 42.) Defendant moves to dismiss some claims for lack of subject matter jurisdiction due to failure to exhaust administrative remedies and others for failure to state a claim upon which relief may be granted. (Dkt. No. 44.)

**DISCUSSION**

**I.**    **Motion to Dismiss for Lack of Subject Matter Jurisdiction**

    A.    Legal Standard

       Under Federal Rule of Civil Procedure 12(b)(1), a district court must dismiss an action if it lacks jurisdiction over the subject matter of the suit.  *See* Fed. R. Civ. P. 12(b)(1).  "Subject matter jurisdiction can never be forfeited or waived and federal courts have a continuing independent obligation to determine whether subject-matter jurisdiction exists."  *Leeson v. Transamerica Disability Income Plan*, 671 F.3d 969, 975 n.12 (9th Cir. 2012) (internal quotation marks and citations omitted).  Where, as here, a defendant challenges subject matter jurisdiction pursuant to Rule 12(b)(1), "the plaintiff has the burden of proving jurisdiction in order to survive the motion."  *Kingman Reef Atoll Invs., LLC v. United States*, 541 F.3d 1189, 1197 (9th Cir. 2008) (internal quotation marks and citation omitted).

       A party challenging the court's subject matter jurisdiction under Rule 12(b)(1) may bring a facial challenge or a factual challenge.  *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  A facial attack is one where "the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction."  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  In evaluating such a challenge, the court accepts the factual allegations in the complaint as true.  *See Miranda v. Reno*, 238 F.3d 1156, 1157 n.1 (9th Cir. 2001).  In a factual challenge, "however, a court may look beyond the complaint to matters of public record without having to convert the motion into one for summary judgment."  *White*, 227 F.3d at 1242 (citation omitted).  Once the moving party has made a factual challenge by offering affidavits or other evidence to dispute the allegations in the complaint, the party opposing the motion must "present affidavits or any other evidence necessary to satisfy its burden of establishing that the court, in fact, possesses subject matter jurisdiction."  *St Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989).

    B.    Framework for Administrative Exhaustion

       "To establish federal subject matter jurisdiction, [a plaintiff is] required to exhaust her administrative remedies before seeking federal adjudication of her claims."  *EEOC v. Farmer*

United States District Court
Northern District of California

United States District Court
Northern District of California

1  *Bros. Co.*, 31 F.3d 891, 899 (9th Cir. 1994).  While not all administrative exhaustion requirements

2  are jurisdictional in nature, Ninth Circuit "case law holds that substantial compliance with the

3  presentment of discrimination complaints to an appropriate administrative agency *is* a

4  jurisdictional prerequisite." *Sommatino v. United States*, 255 F.3d 704, 709 (9th Cir. 2001).  This

5  requirement applies to Rehabilitation Act claims.  *See Leong v. Potter*, 347 F.3d 1117, 1121-22

6  (9th Cir. 2003) (affirming the district court's determination that it lacked subject matter

7  jurisdiction over the plaintiff's Rehabilitation Act claim because the plaintiff failed to exhaust his

8  administrative remedies).

9         "The jurisdictional scope of the plaintiff's court action depends on the scope of the EEO[ ]

10  charge and investigation."[7]  *Id.* at 1122.  Ordinarily, "specific claims made in district court . . .

11  must be presented to the EEO[ ]." *Id.*  This requirement affords "the agency an opportunity to

12  investigate the charge," provides the "charged party notice of the claim," and "narrow[s] the issues

13  for prompt adjudication and decision." *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1099 (9th

14  Cir. 2002) (internal quotation marks and citation omitted).  To determine the nature of the charge

15  presented, courts rely on the factual statement contained in the plaintiff's administrative

16  complaint.  *See id.* at 1100; *see also Robinson v. Geithner*, 359 F. App'x 726, 728 (9th Cir. 2009)

17  (noting that courts consider the "language in an administrative complaint" when determining

18  whether allegations are exhausted).

19         Courts may also consider charges of discrimination not included in the plaintiff's

20  administrative complaint so long as the charges are "like or reasonably related to the allegations

21  made before the EEO[ ], [or] are within the scope of an EEO[ ] investigation that reasonably could

22  be expected to grow out of the allegations." *Leong*, 347 F.3d at 1122 (internal citation and

23  quotation marks omitted).  Courts must construe EEO charges "with utmost liberality since they

24  are made by those unschooled in the technicalities of formal pleading." *Sosa v. Hiraoka*, 920 F.2d

25  1451, 1458 (9th Cir. 1990) (citation omitted).  "Subject matter jurisdiction extends over all

26

27  _____

[7] Although the Ninth Circuit most often refers to the scope of the *EEOC* charge and investigation,
28  the Court here instead refers to the scope of the *EEO* charge and investigation given that Plaintiff
filed his administrative charge with the EEO and the EEO conducted an investigation.

allegations of discrimination that either fell within the scope of the [EEO Office's] actual investigation or an investigation which can reasonably be expected to grow out of the charge of discrimination" or if the new claims are consistent with the plaintiff's original theory of the case. *B.K.B.*, 276 F.3d at 1100; *see also Green v. Los Angeles Cnty. Superintendent of Schs.*, 883 F.2d 1472, 1475-76 (9th Cir. 1989) (noting that an allegation is like or reasonably related to previous EEO allegations if the prior EEO investigation actually encompassed the additional allegations or if the new allegations could reasonably be expected to grow out of the investigation into the initial charges) (citation omitted). In determining whether a plaintiff has exhausted allegations that he did not specify in his administrative complaint, courts consider the following factors: (1) the "alleged basis of the discrimination;" (2) "dates of discriminatory acts specified in the charge;" (3) "perpetrators of discrimination named in the charge;" and (4) "any locations at which discrimination is alleged to have occurred." *B.K.B.*, 276 F.3d at 1100 (citation omitted).

Courts have found that claims are not like or reasonably related, and thus refused to exercise jurisdiction, where they rely on different theories of discrimination or statutes. *See id.* (holding that an EEOC investigation of discrimination on the basis of race, color, religion, sex, and national origin was not like or reasonably related to a Rehabilitation Act disability discrimination claim); *see also Rodriguez v. Airborne Express*, 265 F.3d 890, 897 (9th Cir. 2001) (refusing to construe the plaintiff's race-based discrimination claim to include a disability discrimination claim because the "two claims involve[d] totally different kinds of allegedly improper conduct, and investigation into one claim would not likely lead to investigation of the other"); *Gomez v. Serv. Emps. Int'l Union Local 87*, No. C 10-01888 RS, 2010 WL 4704407, at *4 (N.D. Cal. Nov. 12, 2010) (holding that a properly exhausted claim for national origin discrimination did not exhaust a gender-discrimination claim even though each claim "allegedly flowed from the same factual scenario").

C.     Analysis

Defendant contends that the Court lacks jurisdiction over the third (failure to accommodate) and fourth (unlawful disclosure) causes of action because Plaintiff has failed to exhaust his administrative remedies.

1.   *Third Cause of Action: Failure to Accommodate a Disability*

Plaintiff has exhausted the claims alleged in the third cause of action, failure to accommodate a disability and engage in the interactive process.  (Dkt. No. 42 ¶¶ 57-61.)  Plaintiff's 2010 Information for Pre-Complaint Counseling forms alleged discrimination for "physical" disability, and his 2010 EEO Complaint alleged "physical/psychological" disability.  (Dkt. Nos. 45-1, 45-2, 45-3.)  His November 2011 Information for Pre-Complaint Counseling form alleged that he was discriminated against on account of his "mental disability."  (Dkt. No. 45-5 at 2.)  "Disability discrimination" encompasses disparate treatment—denying an employee equal jobs or benefits because of the employee's disability, 42 U.S.C. § 12112(a), (b)(4), and failure to accommodate a disability, 42 U.S.C. § 12112(a), (b)(5).  *See Boyd*, 752 F.2d at 413-14 (noting that the Rehabilitation Act incorporates the types of discrimination claims available under the ADA).  Here, Defendant does not dispute that Plaintiff alleged disparate treatment disability discrimination in his administrative complaints: he asserted that he was sent to his Fitness for Duty Exam, denied requests to leave work early, and terminated when Post Office management treated other, non-disabled letter carriers differently.  (*See* Dkt. Nos. 45-1, 45-2, 45-3, 45-5.)  Defendant argues, however, that Plaintiff did not exhaust his failure to provide a reasonable accommodation claim.  But Plaintiff's reasonable accommodation claim is "like or reasonably related" to his exhausted disparate treatment disability claim.

Turning to the factors identified in *B.K.B. v. Maui Police Department*, 276 F.3d 1091 (9th Cir. 2002), the "alleged basis of the discrimination" is the same: Plaintiff's disparate treatment claim alleges that he was treated differently than other letter carriers because of his Asperger's, and his failure to accommodate claim alleges that the Post Office failed to accommodate his Asperger's.  Because both claims allege disability discrimination based on the same condition, this factor weighs in favor of exhaustion.  Next, the dates of discriminatory acts are the same: the disparate treatment claim arises out of Plaintiff's termination, and he alleges he was terminated because the Post Office failed to accommodate his disability.  The perpetrators of discrimination are also the same: Plaintiff alleges that Ms. Suarez and Post Office management treated him differently and denied him reasonable accommodations.  Finally, the locations at which the

1   discrimination is alleged to have occurred are identical: both occurred at the Post Office's

2   Sausalito branch.  Thus, all four *B.K.B.* factors indicate that Plaintiff exhausted the reasonable

3   accommodation claim that was not specified in his administrative complaint.  The inquiry ends

4   here.

5          However, there is further support for this conclusion as Plaintiff's failure to accommodate

6   claim falls within the scope of the EEOC investigation which would reasonably be expected to

7   grow out of the disparate treatment disability charge because the agency actually addressed the

8   failure to accommodate claim.  For example, the EEO's investigative summary references

9   potential accommodations.  (*See, e.g.*, Dkt. No. 50-4 at 19 (quoting a letter from the Post Office

10  Area Medical Director to the Sausalito Postmaster stating that "[a]fter treatment, [Plaintiff] could

11  probably do a job that does not require postal vehicle driving or deadlines"); *id.* at 23 (noting that

12  the Area Medical Director's letter requesting Plaintiff's 2010 Fitness for Duty Exam asked Dr.

13  Bresnick to determine "[w]hether or not his chronic worsening behavioral actions will ever allow

14  him to perform the essential functions of a letter carrier with or without accommodation"); *id.* at

15  46 (noting that an appropriate reasons for referral for a psychiatric examination include "[a] need

16  to determine the ability of the employee to perform the job, with or without accommodation").)

17         Moreover, the administrative judge addressed Plaintiff's reasonable accommodation claim

18  in the 2013 decision granting summary judgment to the Post Office.  (Dkt. No. 45-9 at 16.)  While

19  the administrative judge described Plaintiff as raising the failure to accommodate claim for the

20  first time in opposition to summary judgment (*id.*), the judge did not grant judgment in the Post

21  Office's favor on the claim for a failure to exhaust or because it was outside the scope of the

22  EEO's investigation; instead, the judge ruled there was no "evidence that [Plaintiff] ever asked for

23  any accommodation in a manner that would have triggered a duty by the Agency to consider an

24  accommodation or to engage in the interactive process."  (*Id.*)  In its opinion affirming the

25  administrative judge's decision, the EEOC concurred with the finding that Plaintiff had failed to

26  show that he was denied a reasonable accommodation, likewise concluding that there was no

27  evidence that he requested an accommodation prior to his Fitness for Duty Exam or removal or

28  that the Fitness for Duty Exam report recommended particular accommodations.  (Dkt. No. 45-

United States District Court
Northern District of California

12.)  In other words, the EEOC addressed the failure to accommodate claim on the merits.  At oral argument, Defendant conceded that it cannot identify any case that holds that a court can find a plaintiff failed to exhaust a claim when the EEOC addressed that very claim on the merits.  This lack of caselaw is unsurprising: if the EEOC chose to address a claim on the merits it follows that (1) the EEOC considers the claim to have been expressly raised as part of the administrative process, or (2) the claim is like or reasonably related to the claimant's other claims.  Defendant's insistence that the EEOC did not actually investigate Plaintiff's accommodation claim is meritless: "whether the EEOC in fact conducted *any* investigation at all is not material for purposes of exhaustion."  *B.K.B.*, 276 F.3d at 1100.  Further, in Plaintiff's written request for reconsideration he wrote that Post Office "management should have given [him] a reasonable accommodation for his mental impairments" and instead of doing so, fired him.  (Dkt. No. 45-13.)  This puts to rest Defendant's argument that Plaintiff never raised a failure to accommodate claim at the administrative level.

Defendant's heavy reliance on the Seventh Circuit's decision in *Green v. National Steel Corp.*, 197 F.3d 894 (7th Cir. 1999), is unavailing.  There, the court noted that disparate treatment and failure to accommodate claims "are analyzed differently under the law" so "they are not like or reasonably related to one another, and one cannot expect a failure to accommodate claim to develop from an investigation into a claim that an employee was terminated because of a disability."  197 F.3d at 898.  From this, Defendant urges that the two types of claims can never be "like or reasonably related" for the purposes of exhaustion.  (*See* Dkt. No. 44 at 20.)  Not so, for several reasons.  First, as an out-of-circuit case, *Green* is not binding on the court.  Second, *Green* did not analyze the contents of the administrative complaint or address any similarities between the two claims in any way similar to the parameters the Ninth Circuit mandated in *B.K.B.*  Third, *Green* is distinguishable on its facts.  There, the underlying facts of the exhausted and unexhausted claims did not overlap: the plaintiff's exhausted claim concerned her termination whereas her failure to accommodate claim challenged her employer's failure to provide her with a suitable desk chair and dimmed lights.  197 F.3d at 898.  In light of those facts, courts cite *Green* for the unremarkable proposition that the two types of claims are not "like or reasonably related" when

United States District Court
Northern District of California

United States District Court
Northern District of California

1   the circumstances underlying the claims "have nothing to do with" each other.  *See Morales v.*

2   *Goodwill Indus. Of Southeastern Wis., Inc.*, No. 14 CV 2370, 2014 WL 4914255, at *4 (N.D. Ill.

3   Sept. 30, 2014) (collecting cases).  Here, in contrast, Plaintiff's failure to accommodate claim

4   overlaps with his disparate treatment challenge to his termination because he contends the failure

5   to accommodate led to the termination.

6   Defendant's reliance on *Jones v. Sumser Retirement Village*, 209 F.3d 851 (6th Cir. 2000),

7   is unpersuasive.  While it could be read to support Defendant's position, it is out-of-Circuit

8   authority and did not engage in any analysis similar to the Ninth Circuit's *B.K.B.*-factors test and

9   arguably violates the Ninth Circuit's command that the claimant's administrative charge be

10  viewed with the "utmost liberality."  Finally, and perhaps most importantly, the EEOC did not

11  expressly consider the merits of the *Jones* plaintiff's accommodation claim as did the EEOC here.

12  Defendant's argument that the date a plaintiff identifies in his administrative charge can

13  preclude a reasonable accommodation claim from being like or reasonably related to a disparate

14  treatment claim fares no better.  On this point, Defendant again cites *Jones*, which is inapposite for

15  the reasons described above, and a decision from this District: *Baird v. Office Depot*, No. C-12-

16  6316 EMC, 2014 WL 2527114, at *6 (N.D. Cal. June 4, 2014).  In *Baird*, the court concluded that

17  the plaintiff's reasonable accommodation claim was "like or reasonably related" to his hostile

18  work environment claim.[8]  *Id.* at *4-5.  In reaching that conclusion, the court noted that the

19  plaintiff "left the date blank for when the earliest act of discrimination took place" and "checked

20  the box for continuing action which would put [the d]efendant on notice of various claims[,]" and

21  the factual statement describing the hostile work environment referenced the plaintiff's work

22  restrictions.  *Id.* at *4.  Here, Plaintiff's administrative complaints identified particular dates when

23  the discrimination occurred.  (Dkt. No. 45-1, 45-2, 45-3, 45-5.)  But this fact alone is not

24  dispositive; Defendant has not identified any case that holds that where a plaintiff identifies a

25  particular date of disability discrimination in his administrative complaints, the EEO cannot

26  reasonably be expected to investigate whether reasonable accommodations were available.

27

28  [8] *Baird* involved discrimination claims arising under California's Fair Employment Housing Act, but it applied the *B.K.B.* factors to address exhaustion.  2014 WL 2527114, at *3-4.

Moreover, like *Baird*, Plaintiff's formal EEO complaint alleged that he was subject to a hostile work environment, which would put the Post Office on notice that the discrimination alleged was not a one-time incident, and the subject matters overlap.

One other circumstance bears noting. The Post Office's Information for Pre-Complaint Counseling form does not give an employee the option to identify a claim for failure to accommodate a disability and instead steers employees towards alleging only a disparate treatment claim.[9] (*See* Dkt. Nos. 45-1,45-2, 45-5.) In Section B, the form directs the employee-complainant to identify what "factor(s)" of discrimination he alleges, noting that prohibited discrimination includes actions taken based on the employee's "Race, Color, Religion, Sex, Age (40+), National Origin, Physical and/or Mental Disability, or in Retaliation[.]" (Dkt. No. 45-2 at 2.) Drilling down on the disparate treatment theory, in Section D, entitled "Comparisons," the form directs the employee-complainant to identify other employees with different "factors" and explain how they were treated differently. (*Id.* at 3.) Put simply, the form asks for comparators to show that the challenged action constituted disparate treatment. In contrast, the form has no section that asks the employee-complainant to identify accommodations he requested or to list when the Post Office denied accommodations. Likewise, the Post Office's form entitled "EEO Complaint of Discrimination in the Postal Service"—*i.e.*, the formal administrative complaint template—has a check-the-box section asking the employee-complainant to identify the type of discrimination alleged. (Dkt. No. 45-3.) That form has a box for disability discrimination, which Plaintiff checked, but it does not offer separate boxes or otherwise distinguish disparate treatment or failure to accommodate discrimination claims. (*Id.*) Thus, the Post Office's forms are geared exclusively towards disparate treatment claims and do not give an employee-complainant an option to specifically identify a failure to accommodate claim. This suggests that courts should be especially lenient—applying something even more flexible than "utmost liberality," *see Sosa*, 920 F.2d at 1458—in construing whether Post Office administrative complaints like Plaintiff's here include failure to accommodate claims. Even without this especially lenient lens, in light of the

_____

[9] The Information for Pre-Complaint Counseling is Post Office Form number 2564-A. (Dkt. Nos. 45-1, 45-2.)

United States District Court
Northern District of California

*B.K.B.* factors and the EEOC's consideration on the merits of Plaintiff's failure to accommodate claim, the Court finds that Plaintiff exhausted the claim.

Defendant does not separately address the failure to engage in the interactive process claim. And indeed, the two are related: an employer has a "mandatory obligation" to engage in the interactive process to determine whether a reasonable accommodation is available when a disabled employee requests one or when the employer recognizes the need for such an accommodation. *See Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1112 (9th Cir. 2000), *vacated and remanded on other grounds*, 535 U.S. 391 (2002). In the SAC Plaintiff brings the two claims together. (*See* Dkt. No. 42 ¶¶ 57-61.) And district courts in the Ninth Circuit have recognized that there is no "stand-alone claim for failure to engage in the interactive process." *Yonemoto v. McDonald*, 114 F. Supp. 3d 1067, 1114 (D. Haw. 2015) (citing *Barnett*, 228 F.3d at 1115). Instead, the two are intertwined: a failure to engage in the interactive process is cognizable only where a reasonable accommodation is available. *See Yonemoto*, 114 F. Supp. 3d at 1115; *see also id.* at n.21 (collecting cases from other Courts of Appeal holding as much). Thus, the claim for failure to engage in the interactive process is "like or reasonably related" to Plaintiff's disparate treatment disability claim for the same reasons as his failure to accommodate claim: because the EEO's investigation reasonably should have encompassed looking into whether the Post Office failed to accommodate Plaintiff's disability, the first step of which would have entailed the Post Office engaging in the interactive process with Plaintiff to identify whether a reasonable accommodation was available.

Accordingly, the Court has subject matter jurisdiction over the failure to accommodate claim.

2.    *Fourth Cause of Action: Impermissible Disclosure of Medical Records*

In the fourth cause of action, Plaintiff alleges a violation of 29 C.F.R. § 1630.14, which provides that employers may require medical examinations of employees and specifies in relevant part that "[i]nformation obtained" pursuant to these examinations "shall be collected and maintained on separate forms and in separate medical files and be treated as a confidential medical record" subject to certain exceptions, such as informing supervisors and managers of necessary job

restrictions or accommodations.  29 C.F.R. § 1630.14(c).

Plaintiff's pre-complaint requests and formal EEO complaints did not cite Section 1630.14 by name or include language that expressly indicates a claim for improper disclosure of medical information.  (*See* Dkt. No. 45-1; Dkt. No. 45-2; Dkt. No. 45-3.)  At oral argument, Defendant emphasized that Section 1630.14 is a "highly technical" and specific statute, so Plaintiff's failure to include the words "improper disclosure" in his factual statement precludes the court from finding the claim like or reasonably related to the claims alleged there.  But a plaintiff need not include the name of the claim to put the agency on notice.  If anything, the "highly technical" nature of the statute leads to the inference that the court should be even more generous in construing whether the factual basis for the claim exists.

But even under the typical "utmost liberality" standard, Plaintiff's January 26 Information for Pre-Complaint Counseling raised the issue of his confidential medical records sufficient to put the agency on notice of his improper disclosure claim.[10]  (*See* Dkt. Nos. 45-5, 45-6.)  Specifically, Plaintiff's January 26 form reads:

> On December 8, 2010 I was issued a "Notice of Removal" and as placed on administrative leave.  On December 14, 2010 I first learned [Ms. Suarez] knew or should have known of my existing medical mental disability.  On December 14, 2010 I first learned that my *personal and confidential medical records* were kept at the Sausalito Post Office.

(Dkt. No. 45-5 at 2 (emphasis added).)  As mentioned above, while Plaintiff's administrative charge did not include the words "improper disclosure" or cite the statute, an administrative charge need not include the specific legal name of a claim to invoke it.  *See Leland*, 576 F. Supp. 2d at 1091.  Given the mandate to construe plaintiffs' EEO charges with "utmost liberality," *see Sosa*, 920 F.2d at 1458, this reference to Ms. Suarez knowing about his disability and to his confidential medical records—even if it did not name the code section or include the words

---

[10] While courts generally look to the factual statement in the formal complaint and not the pre-complaint forms, *see B.K.B.*, 276 F.3d at 1101-02, here Plaintiff did not file a formal complaint alleging the claims included in the January 26 Pre-Complaint Counseling Form.  Instead, the EEO amended his complaint to address these claims.  (*See* Dkt. No. 45-6.)  Thus, the Court can consider the pre-complaint form, especially to the extent that Plaintiff disagrees with the way the EEO framed his claims, which he does here.  *See B.K.B.*, 276 F.3d at 1102.

United States District Court
Northern District of California

1   "improper disclosure"—suffices to establish that the improper disclosure claim is "like or

2   reasonably related" to Plaintiff's exhausted claims.  *See Deppe v. United Airlines*, 217 F.3d 1262,

3   1267 (9th Cir. 2000) (finding the plaintiff's "record of disability" claim "like or reasonably

4   related" to a "perceived disability" claim based on factual statement that his employer "imposed

5   medical restrictions based on '18 month old medical evaluations'" even though the plaintiff did

6   not formally list a record of disability claim in his EEO charge).

7        Even if the language of the factual statement alone were not enough to establish that the

8   claim is like or reasonably related to Plaintiff's exhausted discrimination and retaliation claims,

9   the EEO administrative record shows that the actual EEO investigation encompassed or should

10   have encompassed Plaintiff's improper disclosure claim.  First, the issue of Ms. Suarez's access to

11   Plaintiff's confidential medical information arose repeatedly throughout the EEO investigation.

12   For example, the EEO's May 2011 investigative summary notes that Ms. Suarez "stumbled on"

13   Plaintiff's 1998 Fitness for Duty Exam report and forwarded the file to another Post Office

14   employee.  (Dkt. No. 50-4 at 11.)  She described the confidential report's findings to the

15   investigator.  (*Id.*)  The summary also cites a note from Ms. Suarez that discusses the 1998 Fitness

16   for Duty Exam report, writing "Dr. Raffle states in his letter than [Plaintiff] is not a danger to

17   anyone." (*Id.* at 22.)  Thus, the EEO's investigation uncovered information that Ms. Suarez had

18   access to Plaintiff's confidential medical records.

19        Moreover, the EEO Office understood that Plaintiff was making a medical records

20   disclosure claim and addressed it directly in its decision to partially accept and partially dismiss

21   Plaintiff's claim as amended to include his January 26 Pre-Complaint Counseling form claims.

22   (*See* Dkt. No. 45-6 at 5.)  Specifically, the EEO analyst wrote that "we acknowledge that

23   disclosure of medical information to unauthorized individuals is in violation of the Rehabilitation

24   Act; however, in this case there does not appear to be an occurrence of such disclosure."  (*Id.*)

25   The EEO Office further reasoned that to the extent that Plaintiff's medical records "somehow

26   contributed to his removal, such an allegation . . . should be addressed in conjunction with such,

27   not as a separate or distinct issue."  (*Id.*)  Plaintiff responded in writing asking the EEO to

28   reconsider and include the claims related to his medical records.  (*See* Dkt. No. 50-3.)  Although

United States District Court
Northern District of California

1   Plaintiff asked the EEO to consider the medical records in connection with his discrimination

2   claim (*see id.*), the substance of the claim, and not the label, controls.  *See Ng v. Potter*, C09-192Z,

3   2009 WL 3836045, at *5 (W.D. Wash. Nov. 12, 2009) (in the context of determining whether

4   claims were like or reasonably related, noting that "it is the substance of the charge, and not its

5   label, which controls the analysis") (citation omitted).  Moreover, the EEO's decision not to

6   address Plaintiff's claim as a separate charge "has no bearing on whether" Plaintiff exhausted his

7   administrative remedies.  *B.K.B.*, 276 F.3d at 1099.  Instead, the EEO's acknowledgement of the

8   claim, coupled with the discovery during the course of its investigation that Ms. Suarez did, in

9   fact, have access to Plaintiff's records, indicates that the EEO's investigation into Plaintiff's

10  exhausted claims reasonably encompassed his improper disclosure claim.

11       Defendant's reliance on *Franklin v. City of Slidell*, 936 F. Supp. 2d 691, 710 (E.D. La.

12  2013), is misplaced.  There, the court addressed defendant's motion to dismiss the plaintiff's

13  improper disclosure of medical information for failure to exhaust.[11]  Because the plaintiff's

14  administrative complaints "did not mention any allegedly improper disclosure of medical

15  information" and there was "no evidence that [the p]laintiff brought this grievance to the EEOC at

16  any point during the investigation of his original charge," there was no reason to infer that the

17  administrative investigation would have encompassed wrongful disclosure of medical information

18  charges.  *Id.*  The court specifically noted that "a claim that an employer unlawfully required a

19  medical examination and a claim that an employer unlawfully disclosed confidential medical

20  information are distinct" so the agency's investigation into the former does not reasonably include

21  the latter.  *Id.*  To be sure, the claims are distinct.  But, unlike *Franklin*, in this case Plaintiff's

22  administrative complaints and correspondence with the EEO referenced improper disclosure of

23  medical information and evidence of such violation came to light during the EEO's investigation.

24       Defendant also relies on *Foos v. Taghleef Industries, Inc.*, 132 F. Supp. 3d 1034, 1049

25  (S.D. Ind. 2015), for the proposition that "in analogous circumstances, courts have held that a

26

27  [11] The *Franklin* court addressed exhaustion under 12(b)(6), not 12(b)(1); despite this procedural
    difference, the substantive analysis under the "like or reasonably related" test is the same.  936 F.

28  Supp. 2d at 710.

claim for unlawful disclosure of confidential medical information is distinct from a claim that an employer unlawfully required a medical examination for purposes of administrative exhaustion." (Dkt. No. 44 at 16-17.)  But *Foos* is inapposite.  There, the factual statement "relate[d] solely to the requirement that [the plaintiff] submit to a drug and alcohol test" and did not mention medical records, even though improper disclosure might have led to the decision to test him.  132 F. Supp. 3d at 1049.  Here, in contrast, the factual statement referenced Plaintiff's confidential medical records and noted that they were kept in the Post Office; the reasonable inference to be drawn is that Plaintiff was challenging the disclosure of that information, especially since the EEOC actually interpreted his charge as making such a claim.

For each of these reasons, Plaintiff's improper disclosure claim is like or reasonably related to his exhausted claims such that the Court has jurisdiction over the improper disclosure claim.

## II.    Motion to Dismiss for Failure to State a Claim

A.    Fourth Cause of Action: Disclosure of Medical Records

Defendant contends that the SAC fails to state a claim for improper disclosure of medical records because Plaintiff has failed to adequately allege injury and causation.  (Dkt. No. 44 at 20.) The Ninth Circuit has not addressed the elements of an improper disclosure of medical records claim under the ADA or Rehabilitation Act, but courts that have require plaintiffs to establish that "the disclosed information was confidential and that he suffered some kind of tangible injury as a result of the disclosure."  *McPherson v. O'Reilly Automotive, Inc.*, 491 F.3d 726, 732 (8th Cir. 2007) (citation omitted); *Cossette v. Minn. Power & Light*, 188 F.3d 964, 970 (8th Cir. 1999) ("[Plaintiff] must also establish that [defendant's] violation of the ADA caused some sort of tangible injury."); *see Koch v. White*, 35 F. Supp. 3d 37, 40 (D.D.C. 2014) (noting that the confidentiality provision of the ADA as incorporated into the Rehabilitation Act requires that an employee's medical history be treated as confidential); *Fisher v. Harvey*, No. 1:05-CV-102, 2006 WL 849868, at *5 (E.D. Tenn. Mar. 31, 2006) (noting that Section 1630.14(c) "mirrors the statutory confidentiality provisions found in 42 U.S.C. § 12112(D)(3)(B)" and thus the case law for the statutory provision is instructive).

Defendant does not dispute that the SAC adequately alleges the first element, as a Fitness

for Duty Exam report is the type of confidential information that falls within the law's protective reach.  *See Franklin*, 936 F. Supp. 2d at 711 (noting that to success on a Section 12112(d) disclosure claim, the employer must obtain the medical information through a disability-related inquiry) (citations omitted); *Fisher*, 2006 WL 849868, at *7 (noting that employers must keep confidential records of employer-conducted voluntary medical examinations and inquiries into the ability of an employee to perform job-related functions) (citing 42 U.S.C. § 12112(d)(4)(B), (C)).

Plaintiff also has adequately alleged the second element—that the disclosure caused a tangible injury.  He alleges that Ms. Suarez repeatedly referenced the contents of his confidential medical records, that the records were not kept confidential, and that Ms. Suarez terminated Plaintiff.  (*See, e.g.*, Dkt. No. 42 ¶¶ 31-33.)  Although the improper disclosure happened as early as 2007 and Plaintiff was not terminated until December 2010, Ms. Suarez quoted and referenced the confidential records as late as August 2010—one month before ordering Plaintiff to undergo a Fitness for Duty Exam and four months before she terminated him.  (*See, e.g.*, *id.* ¶¶ 30-31.) Drawing all inferences in Plaintiff's favor, Ms. Suarez's repeated reference to specific, negative language Dr. Raffle's 1998 report plausibly alleges that the disclosure of that report was a substantial factor—*i.e.*, proximately caused—Plaintiff's termination.

Defendant's arguments to the contrary are unpersuasive.  First, in Defendant's view, termination cannot constitute tangible injury for the purposes of a disclosure claim because it is a separate cause of action, not an injury flowing from disclosure.  (*See* Dkt. No. 51 at 15.)  Some courts have found actionable violations of disability-related disclosure laws where the injury that results is distinct from related adverse employment actions.  *See, e.g.*, *EEOC v. Ford Motor Credit*, 531 F. Supp. 2d 930, 943 (M.D. Tenn. 2008) (at summary judgment, finding a cognizable "tangible injury" where there was a genuine dispute regarding whether plaintiff suffered emotional distress).  But those courts did not address, let alone foreclose the possibility, that an adverse employment action might suffice, and other courts have recognized that an adverse employment action can serve as the tangible injury flowing from disclosure.  *See, e.g.*, *Cossette v. Minn. Power & Light*, 188 F.3d 964, 970 (8th Cir. 1999) (finding disputed issues of fact existed involving tangible injury—specifically, whether the employer decided not to hire plaintiff because of her

medical disclosure); *see also Franklin*, 936 F. Supp. 2d at 711 (concluding that the plaintiff did not adequately allege tangible injury from disclosure because nothing in the complaint suggested that the plaintiff's termination was based on the disclosure). This is unsurprising, as a "confidential disclosure claim is most typically asserted by a plaintiff-employee as part of a more general disability discrimination lawsuit." *In re Nat'l Hockey League Players' Concussion Injury Litig.*, 120 F. Supp. 3d 942, 950 (D. Minn. 2015) (citation omitted). Thus, Plaintiff's ultimate termination may serve as the "tangible injury" for the purposes of an improper disclosure claim.

Defendant's argument that the SAC does not adequately allege that Plaintiff's termination is the tangible injury at issue fares no better. In the improper disclosure cause of action Plaintiff alleges that "as a direct and proximate cause of the unlawful discrimination by defendant, [Plaintiff] suffered damages caused by defendant's wrongful acts" outlined in a separate and general "damages" section. (Dkt. No. 42 ¶ 69.) Because this paragraph references "unlawful discrimination" and not "improper disclosure," Defendant urges that Plaintiff has not even alleged that the improper disclosure itself resulted in the damages set forth in the general damages section of the SAC. But to conclude as much the Court would have to draw inferences in Defendant's favor, which flips the legal standard on its head. Instead, drawing all reasonable inferences in Plaintiff's favor, he adequately alleges that the improper disclosure caused him to suffer the damages set forth in the general damages section, which include "harm by loss of his employment position" (*id.* ¶ 71)—termination—because the information Ms. Suarez learned from the confidential report contributed to her decision to fire Plaintiff. If Plaintiff does not ultimately succeed on his disparate treatment disability discrimination claim challenging his termination, it may well be that he cannot claim the termination as damage flowing from the wrongful disclosure. But it is too early now to exclude such damages as a matter of law.

Defendant next contends that causation is absent. In its view, Ms. Suarez's ultimate termination of Plaintiff could not be caused by Dr. Raffle's 1998 report because Dr. Raffle concluded that Plaintiff was fit to perform the duties of a letter carrier. (Dkt. No. 51 at 15.) In other words, even if termination is the tangible injury, it is not causally connected to the alleged improper disclosure. But Dr. Raffle concluded that Plaintiff was *unfit* for duty, and that decision

23

1    was only overturned after two other physicians determined otherwise.  The SAC also alleges that

2    Ms. Suarez focused on, and quoted verbatim, portions of the report that describe Plaintiff's

3    condition and symptoms, which further connects the records disclosure to Plaintiff's termination.

4            Trying a different tack, Defendant insists that the improper disclosure claim fails because

5    the SAC alleges that Defendant had been aware of Plaintiff's mental health conditions for well

6    over 15 years and therefore disclosure of Plaintiff's mental health condition in the report cannot

7    have caused him any harm.  (Dkt. No. 42 ¶ 43.)  It is true that no injury flows from improper

8    disclosure where the plaintiff had already disclosed the same information.  *See EEOC v. C.R.*

9    *England, Inc.*, 644 F.3d 1028, 1047 (10th Cir. 2011) ("In sum, if an employer discloses medical

10   information that was voluntarily offered by an employee . . . then the employer is not subject to

11   liability[.]"); *Koch v. White*, 35 F. Supp. 3d 37, 40-41 (D.D.C. 2014) (no improper disclosure

12   where the employee already voluntarily disclosed the information in the confidential records).  But

13   the SAC does not allege that Plaintiff ever disclosed the information contained in the Raffle

14   report.  Instead, it only alleges that Defendant was aware of "Plaintiff's *conditions* for well over 15

15   years."  (Dkt. No. 42 ¶ 43 (emphasis added).)  Drawing all inferences in Plaintiff's favor, this

16   vague reference to the Post Office's awareness of Plaintiff's "conditions"—which the Court

17   construes as a reference to his Asperger's disorder and related symptoms—is not tantamount to

18   knowledge of Dr. Raffle's conclusion that Plaintiff was unfit for duty and the specific negative

19   findings in his report.  Thus, this allegation does not undermine Plaintiff's improper disclosure

20   claim.

21           For each of the above reasons, Plaintiff states a plausible claim for improper disclosure of

22   medical records.

23           B.       First and Third Causes of Action: Disability Discrimination

24           Defendant argues that the SAC fails to state a claim for disability discrimination—both

25   disparate treatment and failure to accommodate a disability—because Plaintiff does not identify

26   the disability upon which he bases his claims.  (Dkt. No. 44 at 22-23.)  To state a disability

27   discrimination under the Rehabilitation Act, a plaintiff must allege facts sufficient to plausibly

28   allege that he suffers from a disability.  *See Walton v. U.S. Marshals Serv.*, 492 F.3d 998, 1005

United States District Court
Northern District of California

United States District Court
Northern District of California

(9th Cir. 2007) (disparate treatment) (citations omitted); *Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1045 (9th Cir. 1999) (failure to accommodate); *see also* 29 U.S.C. § 705(20) (noting that, under the Rehabilitation Act, a plaintiff has a disability if he "has a physical or mental impairment which for such individual constitutes or results in a substantial impediment to employment[,]" and "can benefit in terms of an employment outcome from vocational services"). Plaintiff does so here.  He alleges that he "suffers from Asperger's disorder – a medical condition and mental disability related to autism[.]"  (Dkt. No. 42 ¶ 16.)  He then describes that he suffers from a series of conditions *related to* his Asperger's disorder.  (*Id.* ¶ 17.)  While Plaintiff should clarify during discovery the extent to which the other conditions or symptoms existed and served as the basis for his claims, his identification of Asperger's disorder and related conditions is sufficient to withstand Defendant's motion to dismiss.

## CONCLUSION

For the reasons described above, the Court DENIES Defendant's motion to dismiss. Defendant shall answer Plaintiff's SAC within the time prescribed by Federal Rule of Civil Procedure 12(a)(4).

A Case Management Conference is scheduled for March 9, 2017 at 1:30 p.m.  The parties shall file a joint case management statement at least one week before the conference that includes a proposed schedule for the case.

This Order disposes of Docket No. 44.

**IT IS SO ORDERED.**

Dated: January 27, 2017

JACQUELINE SCOTT CORLEY
United States Magistrate Judge